UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA C. CHAMBERS,              :
                                 :
         Plaintiff,              :
                                 :
    v.                           :  Civil Action No. 05-0380 (JR)
                                 :
U.S. DEPARTMENT OF THE INTERIOR, :
                                 :
         Defendant.              :

**MEMORANDUM**

      Teresa Chambers, the former Chief of the U.S. Park Police, brings this action under the Privacy Act, 5 U.S.C. § 552a(g), seeking injunctive and declaratory relief, damages, and attorneys' fees and costs.  Count I of her two-count complaint is for wrongful refusal to provide access to records, in violation of 5 U.S.C. § 552a(d).  Count II is for failure to establish appropriate rules and safeguards, in violation of 5 U.S.C. §§ 552a(e)(9) and (10).  Chambers moves for summary judgment, while the defendant, the Department of Interior ("DOI"), moves to dismiss, or alternatively, for summary judgment.  For the reasons discussed below, defendant's motion for summary judgment as to Count I will be **granted**.  Count II will be **dismissed** for failure to state a claim.

**Background**

A. Factual Overview

From February 10, 2002, to July 9, 2004, Teresa Chambers served as Chief of the U.S. Park Police, a sub-division of the National Park Service ("NPS") in the Department of the Interior.  During Chambers' tenure as Chief, her day-to-day supervisor was NPS Deputy Director Donald Murphy.

On September 22, 2003, Murphy sent an email to Chambers stating, "I have completed your performance appraisal.  [My secretary] will contact you to set up a time for us to go over the appraisal."  [Dkt. 29, Ex. A].  In an affidavit, Chambers states that, on or about the same day, Murphy told her in person that he had completed her performance appraisal, adding, "Don't worry.  It's a good one."  Chambers Aff't at ¶ 7 [Dkt. 29].  This was the only performance appraisal ever mentioned to Chambers during her tenure as Chief.  The meeting between Murphy and Chambers that was to address her performance evaluation never occurred.

During an interview with the Washington Post on November 20, 2003, Chambers voiced concerns about budgetary constraints facing the Park Service.  Portions of this interview were quoted in a story published on December 2, 2003.  On that same day, Chambers sent an email to "a high-ranking staff member of the Congressional Subcommittee that oversees the DOI and its

budget," repeating her concerns about the ability of the Park Police to carry out its mission given current appropriations. Compl. at ¶ 9.  The contents of that email were shared with Chambers' supervisors, including Murphy.

Three days later, on December 5, 2003, the Department of Interior placed Chambers on administrative leave while her conduct was investigated.  On December 12, 2003, Chambers was told that she could return to work and continue on as Chief if she agreed to certain stipulations regarding contacts with the media and Congress.  Chambers refused this offer and, on December 17, 2003, Murphy proposed her removal from federal employment.  In response, Chambers filed a complaint with the Office of Special Counsel ("OSC"), alleging reprisal in response to protected whistleblowing.  When OSC took no action on her complaint, Chambers appealed to the Merit Systems Protection Board ("MSPB") on June 28, 2004.  During the pendency of her MSPB appeal, the Deputy Assistant Secretary of Interior for Fish, Wildlife and Parks issued a decision terminating Chambers' federal service.

During the internal investigation at the DOI and again in proceedings before the MSPB, Murphy stated under oath that a performance appraisal had been completed for Chambers.  As part of the internal DOI investigation, Murphy was interviewed on February 6, 2004, by Deputy Assistant Secretary Paul Hoffman.

Murphy was asked if Chambers had been given a performance evaluation. Murphy responded that "one was prepared and was being scheduled for her just as these incidents happened. So there is one that's actually prepared and it was – the only reason it hadn't been done was because of scheduling conflicts." [Dkt. 29, Ex. E at 105]. On August 11, 2004, in preparation for an MSPB hearing, Murphy gave the following sworn deposition testimony:

> Q. Have you prepared a written performance appraisal for Ms. Chambers in her position as the chief since she took that job?
> A. Yes.
> Q. And that was a written appraisal?
> A. Yes.
> Q. And what form did it take? Was it a narrative? Was it –
> A. It was a narrative.
> Q. Okay. Was it titled a job appraisal? Performance appraisal?
> A. It was just titled performance appraisal.
> Q. And was it communicated to Ms. Chambers?
> A. No.

[Dkt. 29, Ex. F at 18-19]. In his deposition, Murphy discussed the appraisal in considerable detail, stating that: (1) he had prepared the appraisal during the late summer of 2003; (2) it was in "final form"; (3) if not for scheduling issues, he would have sat down and discussed it with Chambers; and (4) Terrie Fajardo, the retired Chief of Human Resources for the Park Service, had seen the completed appraisal. Id. at 20-23.

On October 26, 2004, Chambers submitted a FOIA/Privacy Act request for "a draft employee evaluation written by Deputy Director Donald Murphy concerning Chief Teresa Chambers during the time period covering 2002 and/or 2003 [and] [a]ll routings or transmittal documents indicating what officials received copies of the draft evaluation[.]"  Compl. at ¶ 24.  Diane Cooke, the FOIA/Privacy Act Officer for the National Park Service, initially handled Chambers' document request.  Because the request described Murphy as the author of the evaluation, Cooke determined that his files would likely contain any responsive documents.  Cooke Decl. at ¶ 4 [Dkt. 26, Ex. 1].  Murphy searched his own email but found no responsive documents.  [Dkt. 26, Ex. 4 at 23-25].  Murphy's secretary, Janice Brooks, also searched Murphy's files.  Cooke Decl. at ¶ 5.  Brooks did not find any documents that she believed were directly responsive to the request, although she did find a document entitled "Senior Executive Service Performance Plan" ("SES Plan").  The SES Plan lists standards that were to be used in Chambers' appraisal.  [Dkt. 26, Ex. 8 at 68].  Dated February 11, 2003, the SES Plan does not contain narrative comments actually evaluating Chambers.  [Dkt. 26, Ex. 1, Attachment J].

Brooks forwarded Chambers' document request along with the SES Plan to Steve Krutz, an Employee Relations Specialist at the NPS.  He was to determine whether the SES Plan was responsive

to Chambers' request, and also search his own files.  Krutz did not find any additional files, and members of Office of the Solicitor who reviewed the SES Plan decided that it was non-responsive.  Cooke Decl. at ¶ 6.  On January 18, 2005, the DOI informed Chambers that no responsive documents had been located.  Id. at ¶ 8.  Through counsel, Chambers wrote back on January 26, 2005, to again request that the agency produce her performance evaluation.  A copy of Murphy's August 11, 2004, deposition testimony concerning the evaluation was attached to this renewed request.  Id. at ¶ 9.

On February 11, 2005, Diane Cooke forwarded Murphy's deposition testimony to him and asked that he again search his files and produce any responsive documents.  Id. at ¶ 12.  After reading his August 2004 testimony, Murphy responded to Cooke that the document he had referred to in his deposition was actually the SES Plan.  Id.  Murphy later signed a declaration to the same effect.  [Dkt. 16, Ex. B].  The SES Plan was released to Chambers in mid-March 2005, three weeks after she filed this suit on February 24, 2005, alleging violations of the Privacy Act.  Cooke Decl. at ¶ 15.

After this action was filed, Stephanie Yu, an attorney-advisor in DOI's Office of the Solicitor, contacted Terrie Fajardo, the retired head of NPS human resources whom Murphy had identified in his August 2004 deposition as having seen Chambers'

appraisal. Fajardo told Yu that she had created a performance appraisal for Chambers. Id. at ¶ 16. In a deposition taken by the plaintiff in late 2005, Fajardo recalled preparing an appraisal of Chambers at Murphy's direction and stated that, aside from the necessary signatures, the appraisal had been finalized. [Dkt. 26, Ex. 4 at 20]. Fajardo testified that she hand-delivered a hard copy of the appraisal to Murphy "in a blue envelope," the color she typically used for sensitive communications, and also kept copies of the document on her computer, on a floppy disk, and in a yellow folder labeled "Chambers" or "Chief Chambers" in a locked file cabinet in her office. Id. at 22, 27, 35-36, 47. In August 2005, Fajardo returned to her former office to attempt to locate the appraisal. She found the document on a floppy disk, but the narrative comments and ratings were missing. Only the first portion of the evaluation, setting out the performance standards, was included. Fajardo was not given access to her paper files or to the full set of her floppy disks. Id. at 37-38, 53. Fajardo's old computer was no longer available to be searched, because, "pursuant to standard agency practice," it had been prepared for "surplus and disposal" in July 2005, with "the hard drive memory of [the] computer [] erased in its entirety as part of this preparation." [Dkt. 28, Ex. 4 at 4]. Months later, in November 2005, Yu and Robin Friedman, the then-Acting Assistant Solicitor

of the DOI, met with Ella Drummond, who replaced Fajardo as the Chief of Human Resources for the NPS. <u>Cooke Decl.</u> at ¶ 20. Drummond directed Yu and Friedman to three file cabinets containing files Fajardo had maintained before retiring. Although the files were organized by name, Yu and Friedman did not find a folder labeled with Chambers' name, nor did they come across her performance appraisal. <u>Id.</u> at ¶ 24. Finally, on September 8, 2006, Yu personally conducted a page-by-page search of all files related to Chambers that Murphy maintained in his office. No performance appraisal of Chambers was found. <u>Id.</u> at ¶ 25.

<u>B. Procedural History</u>

The government previously moved for summary judgment, arguing that the disputed performance appraisal, if it ever existed, was not covered by the Privacy Act because it was not a record within a statutorily-covered system of records. Those arguments were rejected, and the government's summary judgment motion was denied. Dispositive cross-motions are now pending before the Court. Chambers moves for summary judgment arguing that the DOI violated the Privacy Act by failing to release her "performance appraisal to her and/or for failing to secure the document to prevent improper destruction or loss." [Dkt. 28 at 41]. The defendant moves to dismiss for lack of jurisdiction or

for failure to state a claim.  In the alternative, the DOI argues that it is entitled to summary judgment.  [Dkt. 26].

## **Analysis**

The purpose of the Privacy Act is to "safeguard[] the public from unwarranted collection, maintenance, use and dissemination of personal information contained in agency records . . . by allowing an individual to participate in ensuring that his records are accurate and properly used." Bartel v. F.A.A., 725 F.2d 1403, 1407 (D.C. Cir. 1984).  Under the Act, each "agency that maintains a system of records" must, "upon request by any individual to gain access to his record or to any information pertaining to him which is contained in the system, permit him . . . to review the record and have a copy made of all or any portion thereof in a form comprehensible to him."  5 U.S.C. § 552a(d)(1).  The Act also requires agencies to "establish rules of conduct for persons involved in the design, development, operation, or maintenance of any system of records" id. at § 552a(e)(9), and to "establish appropriate administrative, technical and physical safeguards to insure the security and confidentiality of records and to protect against any anticipated threats or hazards to their security or integrity which could result in substantial harm, embarrassment, inconvenience, or unfairness to any individual on whom information is maintained."  Id. at § 552a(e)(10).

When an agency fails to comply with the Privacy Act "in such a way as to have an adverse effect on an individual," the Act allows for civil suit.  Id. at § 552a(g)(1)(D).  Injunctive relief may be awarded for access claims under § 552a(d)(1).  For rules and safeguards claims under §§ 552a(e)(9) and (e)(10), damages may be awarded if the Court determines that the agency "acted in a manner which was intentional or willful[.]"  Id. at § 552a(g)(4).

A. Failure to Provide Access to Records

Chambers' FOIA/Privacy Act requests did not result in access to the performance appraisal that she sought.  The record strongly suggests that an appraisal was in fact completed, but no definitive factual finding on that question is required in order to decide the pending cross-motions.  When a plaintiff requests access to a Privacy Act record under § 552a(d)(1), and the agency fails to produce the record because it could not be found, the only remedy the Court can offer is to order the agency to search again.  See 5 U.S.C. §§ 552a(g)(1)(B), (g)(3)(A).  The dispositive question for a claim pursuant to § 552a(d)(1) is not whether the document exists or once existed.  The issue, instead, is whether the agency conducted an adequate search for it. Standards for judging the adequacy of the search are provided by the analysis used in FOIA cases.  See McCready v. Nicholson, 465 F.3d 1, 14 (D.C. Cir. 2006).

"In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." Oglesby v. United States Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  To make the required showing, the defendant must submit a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched[.]"  Id.  There is, however, "no requirement" under FOIA or the Privacy Act "that an agency search every record system." Id.  Likewise, "a search is not unreasonable simply because it fails to produce all relevant material[.]"  Meeropol v. Meese, 790 F.2d 942, 952 (D.C. Cir. 1986).

The Cooke declaration, which gives a detailed description of the numerous searches that the DOI conducted, suffices to show that the search conducted was adequate, or, at the very least, that a more adequate search is no longer possible.  The search of Murphy's files was unquestionably sufficient.  The Cooke declaration explains that these files were searched on three separate occasions, twice by Murphy and his secretary, and once by Ms. Yu.

Chambers' frustration with the agency's search is understandable.  Farjardo's files were first searched after this

- 11 -

suit was filed, and even then, in fits and starts -- search of the floppy disks occurred in August 2005 while Farjardo's paper files were not searched until November 2005.  Even more regrettable is the fact that "pursuant to standard agency practice," the hard drive on Farjardo's computer was erased nine months after Chambers made her first FOIA/Privacy Act request, without ever being searched.  "[A] search need not be perfect," however, "only adequate, and adequacy is measured by the reasonableness of the effort in light of the specific request."  Meeropol, 790 F.2d at 956.  The Cooke declaration explains that all presently existing systems of records which might reasonably have been expected to contain the performance evaluation have been searched, some of them numerous times.  That Farjardo's files were searched belatedly, only after this suit was filed, is immaterial to the question of whether the agency finally conducted a reasonable search.  See Landmark Legal Found. v. EPA, 272 F. Supp. 2d 59, 62 (D.D.C. 2003)("The only question for summary judgment is whether the agency finally conducted a reasonable search, . . . . [w]hen exactly a reasonable search was conducted is irrelevant.").  Once the Court is satisfied that all currently existing record systems likely to contain responsive material have been searched, there is "'no further judicial function to perform'" other than to grant the DOI's motion for summary judgment on this claim.  Tijerina v. Walters, 821 F.2d

789, 799 (D.C. Cir. 1987)(quoting Perry v. Block, 684 F.2d 121, 125 (D.C. Cir. 1982)).

B. Failure to Establish Rules and Safeguards

The provisions of the Privacy Act invoked by the plaintiff in Count II -- §§ 552a(e)(9) and (e)(10) -- require agencies to establish information security safeguards and rules governing the conduct of individuals who handle Privacy Act records.  Chambers' complaint contains no specific allegations as to how the DOI has failed to meet these procedural obligations.  Instead of offering facts about the procedures that DOI does or does not have in place and allegations as to why they fall short, plaintiff's complaint invites the Court to speculate that non-production of the appraisal is the result of some unspecified procedural deficiency.  In order to satisfy the intent requirement imposed by § 552a(g)(4), the Court would have to further speculate that the DOI's failure to establish the requisite rules and safeguards resulted from "something greater than gross negligence."  Tijerina, 821 F.2d at 799.  It is doubtful that Count II contains enough supporting facts to survive the defendant's Rule 12(b)(6) motion to dismiss.  Bell Atlantic Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)("Factual allegations must be enough to raise a right to relief above the speculative level.").

However, even more than the pleading requirements imposed by Bell Atlantic, the real stumbling block for Chambers' claim in Count II is that it is essentially a claim for unlawful document destruction. Although the Privacy Act "imposes a series of substantive and procedural obligations" on federal agencies as to how they maintain their record systems, Maydak v. United States, 363 F.3d 512, 515 (D.C. Cir. 2004), the Act does not mandate document retention. Nor does the Privacy Act provide "individuals a remedy for the destruction of agency records, even if the destruction of records was done improvidently." Lauglin v. Commissioner, 103 F. Supp. 2d 1219, 1225 (S.D. Cal. 1999). Under the Federal Records Act, 44 U.S.C. § 2901 et seq. ("FRA"), which governs the creation, management, and disposal of federal records, only the Attorney General is empowered to bring suit to prevent unlawful destruction of covered records. See Armstrong v. Bush, 924 F.2d 282, 294 (D.C. Cir. 1991) ("[The FRA] requires the agency head, in the first instance, and then the Archivist to request that the Attorney General initiate an action to prevent the destruction of documents, thereby precluding private litigants from suing directly to enjoin agency actions in contravention of agency guidelines."). If an appraisal was created only to be lost or destroyed, Chambers' remedy, if there is one, will be for spoilation in her underlying employment proceeding against the DOI, not in this Privacy Act case. The

defendant's Rule 12(b)(6) motion to dismiss this claim must accordingly be granted.

      An appropriate order accompanies this memorandum.


                                      JAMES ROBERTSON
                           United States District Judge